**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**JEFFREY D. STONEBRAKER**
Clark County Chief Public Defender
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana



FILED
Jul 17 2012, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ERIK MORALES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 10A01-1110-CR-554 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Daniel E. Moore, Judge
Cause No. 10C01-1008-FA-604

**July 17, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Erik Morales ("Morales") appeals his convictions following a jury trial on two counts of child molesting,[1] each as a Class A felony, and one count of attempted child molesting[2] as a Class A felony. On appeal he raises the following restated issues:

I.      Whether three witnesses vouched for D.'s credibility in a manner that constituted fundamental error; and

II.     Whether the State presented sufficient evidence to support Morales's convictions for Class A felony child molesting and Class A felony attempted child molesting.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Crystal is the mother of three daughters, D., C., and E. C. and D. were born prior to Crystal's April 2008 marriage to Morales, who is the biological father of Crystal's youngest daughter, E. In March 2010, when D. was nine years old, the family moved to Webster Boulevard in Jeffersonville, Clark County, Indiana. Morales was unemployed during the summer of 2010, and he stayed at home to care for the children while Crystal worked.

On August 8, 2010, Morales's biological daughter from another relationship, Z., was in town visiting. Crystal, who had a sixteen-hour shift the following day, went to bed around 8:00 p.m. A few hours later, Crystal awoke and noticed that Morales was not in bed. Since she had gone to bed so early, Crystal decided to check on the girls. She found Z. and C. curled up together watching television. Crystal went down the hallway

---

[1] *See* Ind. Code § 35-42-4-3(a)(1).

[2] *See* Ind. Code §§ 35-41-5-1, 35-42-4-3(a)(1).

2

to check on D. and noticed that D.'s bathroom light was on. As Crystal approached D.'s bedroom door, the glow of the light shining into D.'s bedroom illuminated the scene of Morales sitting on the foot of D.'s bed. At trial, Crystal testified that Morales was "sitting in between D.'s leg[s] with his hand up the bottom of her shorts." *Tr.* at 206-07. Crystal yelled for Morales to "get up, get off of her," and Morales started shaking D.'s leg, saying her name and telling her to wake up. *Id.* at 207. Morales told Crystal he was trying to wake D. Crystal responded, "[T]hat's not how you wake up a little girl." *Id.* at 211.

Crystal made Morales leave the bedroom, she shut the door, and asked D. what was going on. D. was scared and shaking. Crystal asked, "Was Erik doing anything to you? . . . You got to tell me. I know what I just seen. You tell me what's going on." *Id.* at 207. D. responded, "[S]ometimes Erik touches me." *Id.* Crystal told D. to stay in the room, said she would be right back, left, and shut the door behind her. When Crystal saw Morales, he asked, "[W]hat did she say?" *Id.* at 208. Crystal responded that D. had said nothing, and Morales said, "I don't know why you would think I would do something like that to D. I love her like a daughter." *Id.* Crystal grabbed her cell phone and returned to D.'s room where, without Morales's knowledge, she called the police. Crystal noticed that there was a wet spot on D.'s sheets. Crystal then left the room and, leaving the cell phone with D., told D. not to open the door for anyone but her. *Id.*

Officer Scott Maples. Jr. ("Officer Maples") and a second officer with the Clark County Sheriff's Department responded to the 911 call. When questioned, Crystal said that she had seen Morales on D.'s bed, with his hand up her pants. The police obtained

3

similar information from D. about the incident. Morales told Officer Maples that he did not molest D., but said that "he thought the best avenue to make her stop kicking" while trying to wake her up "was to crawl into bed with her." *Tr.* at 71. Officer Maples did not find that to be a good response. *Id.*

Officer Maples called in Detective Harold Kramer, who was the on-call detective for the Clark County Sheriff's Department that night. Detective Kramer took pictures and collected evidence at the scene, and recommended that D. be seen by a sexual assault nurse examiner ("SANE"). Shortly after the August 8 incident, Kathy Scifres ("Scifres"), a registered nurse with the SANE program, performed a medical forensic examination on D. As part of the exam, D. told Scifres "that fingers had been placed inside and outside the female genital area or the female sex organ and that she . . . had been rubbed or touched there repeatedly." *Tr.* at 111. When asked, D. described the digital penetration in greater detail. *Id.* at 113. In response to Scifres's inquiry as to who had done that, D. answered that it had been Morales, her stepfather. *Id.* at 112.

After his arrest, the State charged Morales with four counts of child molesting. Counts I and II alleged child molesting as a Class A felony on the basis that Morales performed deviate sexual conduct when he digitally penetrated D.'s vagina. *Appellant's App.* at 41. Count I alleged that the crime was committed on or about August 7, 2010, while Count II alleged the crime was committed between May 2010 and August 6, 2010. *Id.* Count III alleged attempted child molesting as a Class A felony on the basis that on or about August 8, 2010, the night Crystal called the police, Morales attempted to perform deviate sexual conduct on D. *Id.* Finally, Count IV alleged child molesting as a

4

Class C felony on the basis that, between May 2010 and August 2010, Morales fondled or touched D. with the intent to arouse or satisfy his sexual desire. *Id*. at 42. A jury found Morales guilty on all four counts. At sentencing, the trial court vacated the "conviction on Count IV upon double jeopardy principles." *Id*. at 166. The trial court sentenced Morales to forty years executed for each of the Class A felonies and ordered the sentences to run concurrently. Morales now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I.     Vouching Testimony

Morales argues that Crystal, Scifres, and Detective Kramer impermissibly vouched for D.'s credibility during their testimony. Vouching testimony is generally prohibited under Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." This testimony is considered to be an "invasion of the province of the jurors in determining what weight they should place upon a witness's testimony." *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012). "In other words, it is essential that the trier of fact determine the credibility of the witnesses and the weight of the evidence." *Id*.

Morales contends that it was error for the trial court to admit the following testimony of Crystal, which he contends constituted vouching.

> [State]:     You believe [D.] when she tells you that Erik has been touching her?

[Crystal]: Absolutely. A hundred percent. There's not a doubt in my mind that she would make that up.

[State]: And you're truthful here today as you told us what you walked in on?

[Crystal]: Yes, ma'am. Everything I said is the truth. I have no reason to lie. It's of beneficial [sic] for me or my daughter zero percent for us to go through this. What benefit did I get out of putting my baby on the stand this morning?

*Tr.* at 245.

Morales also argues that the trial court erred in admitting the testimony of Scifres that bolstered the credibility of D. in the eyes of the jury. Specifically, Morales notes that Scifres testified that D. reported that Morales had touched her inappropriately on more than one occasion. When the State asked Scifres if D. had explained why she had not told someone about this inappropriate conduct before, Scifres testified that D. told her that she was afraid to tell her mother. *Tr.* at 113. The State then asked Scifres, "From your over a decade of experience and doing SANE exams, is that a fairly common answer to be afraid to tell?" *Id.* Scifres replied, "Often times there is a delay in reporting physical and sexual abuse, and in my experience as a SANE Nurse, fear of reporting or fear of retaliation is probably [the] number one reason why there is a delay in reporting those incidents." *Id.* at 113-14. Morales argues that "[a]ny questions the jury may have had about the reliability of D.[] because she never told anyone about these incidents were dispelled because a knowledgeable person had assured them this was not uncommon. The testimony suggested D.[] was to be believed." *Appellant's Br.* at 17.

Finally, Morales maintains that it was error for the trial court to allow Detective

6

Kramer, who sat with the prosecution throughout the trial, to testify regarding inconsistencies and consistencies of the testimony of other witnesses. Morales objects to the admission of statements made by Detective Kramer concerning the inconsistencies between statements D. made during the investigation versus those she made at trial. Detective Kramer testified at trial that during his initial investigation D. told him that Morales had digitally penetrated her on August 8. *Tr.* at 260. He then added, "I noticed today that she didn't say that [at trial]." *Id.* The State asked Detective Kramer, "through your decades of experience, is it common to find inconsistencies in a narrative at a later time?" *Tr.* at 263. Detective Kramer responded that it is not unusual for there to be "inconsistencies in a narrative at a later time," but that when a child is traumatized, the child will remember the trauma, but may not remember the details. *Tr.* at 263-64. Attempting to attack D.'s credibility, defense counsel caused Detective Kramer to admit that the act of penetration would be part of the trauma and, as such, should not be a detail that changes. *Id.* at 282. When defense counsel pressed for additional comment as to whether inconsistencies "would be relevant to measure [D.'s] credibility," *id.* at 290, Detective Kramer stated, "This was an excited utterance from a little girl who's . . . giving me information immediately after it happened. That carries a lot of weight as far as credibility. A year later, it's different." *Id.* at 290. Morales maintains that "[a]lthough these questions were from the defense, Kramer used the opportunity to go beyond the questions and offer his personal opinion about D.[]'s credibility." *Appellant's Br.* at 19.

Regarding consistent statements, the State asked Detective Kramer if, other than the discrepancy in D.'s trial testimony, D.'s prior statements were consistent with her trial

7

testimony. Detective Kramer replied "Everything with what she told me was consistent with the exception of whether or not the finger actually penetrated" her on August 8, 2010. *Tr.* at 262. The State then asked Detective Kramer, "Having sat through Crystal's testimony as well, was that consistent with what she told you that night?" *Id.* at 263. Without going into detail, Detective Kramer answered, "Yes." *Id.* Morales contends that this line of questioning bolstered the credibility of the testimony of Crystal and D.

Morales admits that he did not object at trial to Crystal's, Scifres's, or Detective Kramer's testimony that he now claims constituted vouching or bolstering statements. Understanding that he has not properly preserved these issues for appeal, Morales argues that the trial court's error in admitting the above testimony constituted fundamental error.

> The fundamental error doctrine provides a vehicle for the review of error not properly preserved for appeal. In order to be fundamental, the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process. *Baker v. State,* 948 N.E.2d 1169, 1178 (Ind. 2011). Harm is not shown by the fact that the defendant was ultimately convicted; rather harm is found when error is so prejudicial as to make a fair trial impossible. *See id.* at 1179.

*Hoglund v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012). Under the fundamental error doctrine, we will reverse Morales's convictions only if we find that the error is "so prejudicial to the defendant's rights as to make a fair trial impossible," i.e. the error creates a harm or potential for harm that is substantial for Morales. *Baker*, 948 N.E.2d at 1178. We find no such fundamental error.

We first observe that, apart from the alleged vouching testimony, there was substantial evidence of Morales's guilt. Morales was tried over a period of three days.

8

Five witnesses appeared for the State—Officer Maples, Nurse Scifres, D., Crystal, and Officer Kramer. D. testified at length concerning what Morales did to her on August 7, 2010, on August 8, 2010, and during the period between May 2010 and August 6, 2010. D.'s testimony remained consistent and unshaken under direct examination, cross examination, redirect, and recross—testimony that was reflected in over forty pages of transcript. *Tr.* at 130-73.

Morales does not allege that Officer Maples made any vouching statements. At trial, Officer Maples testified that he was the first to respond to Crystal's 911 call. Crystal told Officer Maples that she had seen Morales on D.'s bed "with his hands up her pants." *Tr.* at 67. Officer Maples testified, "At first, it was hard to obtain a statement from [Crystal] because she was so upset about what she had just witnessed." *Id.* D.'s demeanor was "somewhat calm like this wasn't a very big deal, something that she stated happened repeatedly, an everyday occurrence." *Id.* at 68. Officer Maples testified that Morales said Crystal found him as he was trying to wake D. D. had started to kick Morales and "when she kicked her legs [Morales] stated that he thought the only way to stop her from kicking her legs was to crawl in bed with her." Officer Maples said he did not find that to be a very good response. *Id.* at 71.

The portion of Crystal's testimony to which Morales objects is only one-half page of the sixty pages of her transcribed testimony. *Tr.* at 174-247,[3] 245. While Crystal did make the statements to which Morales objects, the objectionable language was elicited by

---

[3] The transcript reflects that, while Crystal was on the stand, the trial recessed for lunch and, prior to bringing the jury back in after lunch, the court addressed a motion in limine offered by the State. *Tr.* at 186-197.

9

the State only after defense counsel had the following exchange with Crystal:

[Defense]: Okay. Do you know, as D's mother, do you know that she's, do you ever find that she has trouble telling the truth.

[Crystal]: She's nine. Does she always, you know, tell the truth about everything? For the most part, I think she does, but you have to remember she's nine. Has she ever come to me and said I didn't get on the computer, when she did? Yeah.

[Defense]: Okay. But she understands, of a situation like this one, of sitting in the witness stand and all these people taking their time to listen to what she has to say, that understands the difference between the truth and a lie?

[Crystal]: I absolutely believe that she does.

[Defense]: Okay. And that when told to tell the truth, she does do that?

[Crystal] Yes, sir. That is correct.

. . . .

[Redirect examination]

[State]: Crystal, address the point where Mr. Grannan left. You're D's mom?

[Crystal]: Yes, ma'am.

[State]: And would you say that you probably know her better than anybody else at this stage?

[Crystal]: I would say, yes, I would.

[State]: You believe her when she tells you that Erik has been touching her?

[Crystal]: Absolutely. A hundred percent. There's not a doubt in my mind that she would make that up. . . .

*Tr.* at 243-45.

Defense counsel's questions as to Crystal's belief in D.'s version of events, opened the door to the State's follow-up questions. Our court has noted, "A prosecutor is entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Hand v. State*, 863 N.E.2d 386, 395 (Ind. Ct. App. 2007) (vouching for deputy's credibility during rebuttal closing argument did not amount to fundamental error). Furthermore, Morales had the last word on the subject. On recross examination, Morales was able to again raise the question of credibility by asking, "Ms. Morales, you said you believe your daughter one hundred percent. Is that true, even if [] she has contradicted herself?" *Id*. at 247.

Finally, Morales was not prejudiced by vouching or bolstering testimony because Morales took the stand in his own defense. Morales's testimony, which amounts to almost one hundred pages of transcript, revealed Morales's version of why he was being wrongfully accused of having committed these crimes against D. He testified that Crystal told him during the afternoon of August 8, 2010 that she wanted a divorce. The jury heard Morales deny evidence to which other witnesses had testified. In testifying, Morales placed his own credibility at issue. "Indiana Constitution Art. 1, Sec. 19 states: 'In all criminal cases whatever, the jury shall have the right to determine the law and the facts.'" *Gantt v. State*, 825 N.E.2d 874, 878 (Ind. Ct. App. 2005). "In keeping with this duty, the jury is free to accept or reject any evidence." *Id*.

Assuming without deciding that it was error for the trial court to allow testimony vouching for or bolstering the credibility of Crystal or D, the challenged testimony did not create a substantial harm or potential for harm or make a fair trial impossible for

Morales, and the vouching and bolstering statements did not constitute fundamental error.

## II.   Sufficiency

Morales also contends that the evidence is insufficient to sustain his convictions for Class A felony child molesting and Class A felony attempted child molesting. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Whatley v. State*, 908 N.E.2d 276, 282 (Ind. Ct. App. 2009) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)), *trans. denied*. We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* "We affirm the conviction unless 'no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.'" *Id.* (quoting *Drane*, 867 N.E.2d at 146). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* "A victim's testimony, even if uncorroborated, is ordinarily sufficient to sustain a conviction for child molesting." *Bowles v. State*, 737 N.E.2d 1150, 1152 (Ind. 2000); see *Johnson v. State*, 804 N.E.2d 255, 256 (Ind. Ct. App. 2004) (uncorroborated testimony of one witness may be sufficient by itself to sustain conviction on appeal).

A conviction for child molesting as a Class A felony requires the State to prove, in pertinent part, that a person at least twenty-one years of age performed sexual intercourse or deviate sexual conduct on a child who is under fourteen years of age. Ind. Code § 35–42–4–3(a)(1). Deviate sexual conduct means an act involving "the penetration of the sex

organ or anus of a person by an object." Ind. Code § 35-41-1-9;[4] *see, e.g., Low v. State,* 580 N.E.2d 737, 740 n.2 (Ind .Ct. App. 1991) (finger is "object" within meaning of statute). "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime." Ind. Code § 35-41-5-1(a).

To convict Morales of Class A felony child molesting, the State had to prove that Morales, who was at least twenty-one years of age, used his finger to digitally penetrate the vagina of D., who was less than fourteen years of age. The State alleged that this happened on two separate occasions—on August 7, 2010 and between May 2010 and August 6, 2010. To convict Morales of Class A felony attempted child molesting, the State had to prove that, on August 8, 2010, Morales, acting with the culpability required for commission of the crime of child molesting, engaged in conduct that constituted a substantial step toward commission of child molesting.

Morales does not raise a question as to the sufficiency of the evidence regarding either his age or D.'s age. Additionally, he concedes that there was sufficient evidence to convict him of Count II. In his brief, Morales "acknowledge[s that] the testimony of [D.] would support the child molesting conviction as addressed in [C]ount II of his criminal information." *Appellant's Br.* at 15. "That count alleged a time frame between May of 2010 and August 6 of 2010 and [D.] did testify that [Morales] had digitally penetrated her on more than one occasion during this time frame." *Id.* Instead, Morales contends that

---

[4] Without making substantive changes, Public Law 114-2012 recodified this section as Indiana Code section 35-31.5-2-94.

the evidence was insufficient to support the convictions for Count I (August 7, 2010) and Count III (the attempt on August 8) and that the evidence favorable to the judgment was derived from the victim, D. *Appellant's Br.* at 8. We disagree.

D. testified that on August 8, 2010 Morales came into her bedroom, lay on her bed by her feet, and tried to wake her up to watch a television show. *Tr.* at 136-38. D. testified that when Morales could not get her to wake up, he touched her, "[O]n my privates." *Id.* at 137. D. clarified that "privates" meant the "genital area in the front." *Id.* D. said that Morales put his hand up inside her shorts from one of the leg holes, and that Morales's hand was under her underwear, "skin-to-skin contact." *Id.* at 153-54. When asked if Morales had ever done a thing like that before, D. testified that it had happened "[e]very night since June." *Id.* at 140. She said that when this happened, her mother was "usually at work or downstairs asleep with the baby." *Id.* Defense counsel asked D., "Did [Morales] put his fingers inside of you?" *Id.* at 141. D. stated that he did not on August 8, 2010, but that he had before. D. explained that on August 8, Morales stopped because Crystal came into D.'s bedroom. "A victim's testimony, even if uncorroborated, is ordinarily sufficient to sustain a conviction for child molesting." *Bowles*, 737 N.E.2d at 1152.

Here, however, Crystal also testified that on August 8, 2010, after waking up around midnight, she went to check on the children. Approaching D.'s room Crystal found Morales at the foot of D.'s bed. One of D.'s legs was underneath Morales, "[a]lmost like a scissor, like they were open, and one of her legs was actually like on top of his lap." *Tr.* at 209-10. Morales's hand was so far up D.'s shorts that Crystal could

14

not see his hand. *Id.* at 210. This testimony was sufficient to prove that Morales took a substantial step toward molesting D. on August 8, 2010, and supported the conviction for attempted child molesting.

Officer Maples testified that he responded to Crystal's 911 call. When he arrived, he noted that Crystal was "highly upset" "because she still wasn't over the fact of what she had just witnessed." *Id.* at 67. "D.'s demeanor was somewhat calm like this wasn't a very big deal; something that she stated happened repeatedly, an everyday occurrence." *Id.* at 68. Even so, Officer Maples testified that D. made a statement "about how [Morales] penetrated her vagina with his fingers and had did it regularly, you know she stated he did it the night before [on August 7, 2010] also between the hours of 8:00 p.m. to 10:00 p.m." *Id.* at 72.

Detective Kramer testified that D. seemed calm when he questioned her at the scene. When he asked D. how frequently Morales had digitally penetrated her with his hand, "She told [him] that it was something she came to expect when mom was at work." *Id.* at 262. Prior to trial, D. stated that Morales had digitally penetrated her on August 8, 2010 as well as August 7, 2010. Noting that D. was inconsistent at trial as to the events of August 8—saying that Morales did not digitally penetrate her that night—Detective Kramer testified that there was no such inconsistency as to the events of August 7. *Tr.* at 260-62. There was sufficient evidence to prove that Morales committed child molesting on D. on August 7, 2010.

Affirmed.

BAKER, J., and BROWN, J., concur.